RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RONALD WOLFE, JR.,

　　　　　　　　　　*Plaintiff-Appellant,*

　　*v.*

ALLAN PERRY et al.,

　　　　　　　　　　*Defendants-Appellees.*

Nos. 02-1086/1589

> 

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-71195—Patrick J. Duggan, District Judge.

Argued and Submitted: November 4, 2004

Decided and Filed: June 27, 2005

Before: MOORE and GIBBONS, Circuit Judges; MILLS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Marcelyn A. Stepanski, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Marvin L. Berris, Bingham Farms, Michigan, Victoria Eva Abdella, Franklin, Michigan, for Appellant. Marcelyn A. Stepanski, S. Randall Field, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees.

_____

## OPINION

_____

　　KAREN NELSON MOORE, Circuit Judge. In these two appeals, Plaintiff-Appellant Ronald Wolfe, Jr. ("Junior") challenges the district court's grant of summary judgment in favor of Defendant-Appellee, Detective Allan Perry ("Perry") as well as the district court's award of attorney fees to Defendants-Appellees Perry, Sheriff's Deputy Ivan Deering ("Deering"), and Assistant Prosecutor Daniel Rose ("Rose"). The district court found that Junior's constitutional claims brought pursuant to 42 U.S.C. § 1983, as well as his state-law claims, were barred by Michigan's three-year statute of limitations. On appeal, Junior argues that the district court erred in holding that the statute of limitations began to run from the date of his arrest. Upon review, we conclude that the district court did err in finding Junior's claims time barred, but that his arrest was supported by

_____

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

probable cause.  Therefore, we **AFFIRM** the district court's grant of summary judgment in favor of Perry on other grounds.  Furthermore, we **AFFIRM** the district court's grant of attorney fees to Deering and Rose as well.  In light of our conclusion that the claims against Perry were not time barred, we **VACATE** the attorney fee award to Perry and **REMAND** to the district court for reconsideration.  Finally, because the award amount was not apportioned among the three defendants, we **VACATE** the entire award amount and **REMAND** to the district court to allow the court to reconsider the award to Perry.

## I.  BACKGROUND

These appeals arise out of a criminal investigation into the activities of Junior, his father, Ron Wolfe, Sr. ("Senior"), and his stepmother, Marie Wolfe (collectively, the "Wolfes").  The Wolfes were under investigation for a series of larcenies committed in Livingston County, Michigan, over a two-year period.  Specifically, the Wolfes were suspected of involvement in the theft of two hundred bales of hay on August 19, 1996; the theft of building materials, including a large amount of OSB panels, from a construction site on September 15, 1996; the theft of roofing materials from another construction site on September 28, 1996; the theft of two golf carts from a country club on January 7, 1995; the theft of two horses from a residence on May 23, 1996; and finally, a fraudulent insurance claim involving residential windows.[1]  The police investigation into the various larcenies was headed by Detective Perry, a deputy with the Livingston County Sheriff's Department.  Perry's investigation of the Wolfes consisted primarily of interviews with William Harp ("Harp"), a former friend of Senior, and Harold Van Patten ("Van Patten"), who worked as a handyman for the Wolfes from November 1994 until 1996 at Senior's residence at 5753 Fisher Road ("the Fisher Road residence").  Van Patten's responsibilities included maintaining the property, caring for the animals, and constructing a pole barn.  From January through September 1996, Van Patten also resided at the Fisher Road residence, living above the barn.

With regard to the stolen hay, Van Patten informed Perry that one night in August 1996 he was awakened by Senior at half past midnight and told to get dressed and get in Senior's truck.  Van Patten noticed that Junior and another man, Rich Munson ("Munson"), were driving a separate truck. The two pickup trucks drove to a field owned by Robert Salmon ("Salmon"), where two wagons filled with hay were located.  Van Patten stated that Senior stood guard with a walkie-talkie, while Van Patten drove the truck onto the field and along with Junior and Munson attached the two wagons to the trucks.  Van Patten stated that he was so upset about stealing the hay that he was unable to drive and therefore, Senior drove the truck back to the Fisher Road residence.  Upon arrival at the residence, Van Patten stated that they drove through pine trees to get to an old airplane hanger located on the north side of the property.  Van Patten told Perry that he helped Senior, Junior, and Munson unload the hay into the hangar, and then return the empty wagons by the side of the road near the Salmon residence, where they were discovered the next day.  Van Patten stated that he believed both Senior and Junior were carrying weapons that night and therefore, he was too afraid to object to participating.  The next day, Van Patten claimed that he told Senior "don't you guys ever get me involved in anything like this again, because I'm not this way."  Joint Appendix ("J.A.") at 286 (Van Patten Dep. at 9).  Van Patten's story was corroborated by a police incident report taken on August 19, 1996, documenting a complaint by Salmon of the theft of bales of hay from his property.

With regard to the stolen construction materials, Harp told Perry that in November 1996, while on a neighboring property, he observed the construction of a pole barn with OSB panels and

---

[1]The Wolfes were also implicated in several other thefts including:  a furnace from a home under construction on November 11, 1994; bee hives on April 19, 1996; construction tools from a residential construction site on February 22, 1996; and campaign signs from a 1996 campaign.  Because these investigations occurred after Junior had been arrested, they are not relevant to his present civil claims.

new shingles at the Fisher Road residence. Harp stated that he told Perry that building materials had been stolen from residential construction sites in the area and suspected the Wolfes' involvement. Perry discussed the matter with Van Patten, whose responsibilities included constructing the pole barn on the Fisher Road residence. Van Patten informed Perry that he went to bed around 12:30 A.M. on September 14, 1996, and the next morning when he went down to feed the livestock he discovered a stack of building materials by the barn. Van Patten claims he asked Senior about the materials, to which Senior responded that Junior and Rich Culbert ("Culbert") had stolen 185 sheets of OSB from a nearby construction site. Van Patten used the materials to construct the remainder of the pole barn. A few weeks later, Van Patten mentioned to Senior that he needed shingles to finish the roof of the pole barn. The next day, Van Patten discovered twenty-five squares of shingles lying on the ground next to the barn along with other roofing materials. Van Patten claims that when he asked Senior about the shingles, Senior responded that Junior and Culbert got them from a house being built down the road. Van Patten used the shingles for the roof of the pole barn. Once again, the story told to Perry was corroborated by a police incident report taken on September 15, 1996, documenting the theft of building materials from a nearby construction site.

With regard to the stolen golf carts, Harp told Perry that in early January 1995, Senior asked Harp if he could borrow Harp's Chevy Suburban as well as if Harp wanted to go for a ride with him. Harp stated that he rode with Senior in a gray sedan to a restaurant located at the Oakpointe Country Club. Junior and another man arrived driving Harp's Suburban and towing Senior's horse trailer. Harp explained that both Junior and Senior had firearms and communicated through walkie-talkies. Harp told Perry that he assisted Senior, Junior, and the other man in loading two cream-colored golf carts into the horse trailer. One of the carts was off-loaded in Harp's barn, while the other was taken to the Fisher Road residence. The following day, Oakpointe Country Club reported that two carts were stolen the previous night. Harp also told Perry that there was an additional golf cart, which looked very similar, already at the Fisher Road residence prior to the January 1995 theft of the other two. Van Patten corroborated Harp's claim by providing Perry with a photograph of the decks he had built at the Fisher Road residence, in which a golf cart is visible in the background of the picture.

During a conversation with Perry on December 18, 1996, Van Patten also mentioned that during the month of May, his work at the Fisher Road residence included taking care of two horses. Van Patten stated that one morning when he went out to feed the livestock, he found two horses inside a stall. Van Patten explained that Senior told him that a woman called at 3 A.M. and said her barn burned down and asked Senior to care for her horses. On May 23, 1996, Ms. Jean Wainscott reported to the police that two of her horses were stolen from her residence. Van Patten had seen photos of the two horses from a friend who worked with Ms. Wainscott and identified them as the horses he took care of for a month on the Fisher Road residence.

Finally, during his conversation with Perry on December 10, 1996, Harp mentioned that in 1994 he had allowed Senior to store about two dozen residential windows in his barn. Harp stated that a month later Junior began transferring the windows from Harp's barn back to the Fisher Road residence. Van Patten informed Perry that during that time he was constructing a log home on the property and was installing the windows. Van Patten stated he would tell Senior the measurements of the windows he needed and Senior and Junior would drive off and return with the windows twenty minutes later. Senior told Van Patten that he and Junior were purchasing the windows at a store in town. Scott Van Patten, Harold's brother, informed Perry that Senior told him that "the windows were stolen and there was an insurance claim made on them." J.A. at 311 (Scott Van Patten Dep. at 26).

After completing his investigation into the various criminal activities of the Wolfes, Perry obtained arrest warrants for Senior and Junior as well as a search warrant for the Fisher Road

residence.**2** On December 23, 1996, the police executed the search warrant and seized various items from the property including sixty bales of hay, OSB panels, shingle-square wrappers, and two golf carts as well as scores of firearms and marijuana plants from a locked basement vault. Senior and Junior arrived on the property during the search and were immediately taken into custody. Criminal charges were subsequently brought against all of the Wolfes in Livingston County Circuit Court.

Senior was originally charged in state court with manufacturing marijuana with the intent to deliver. The state court suppressed the evidence of the marijuana seized from the basement vault, however, because it held that the search of the residence was outside the scope of the warrant. Though the state marijuana charge was subsequently dismissed, Senior was indicted in federal court for violation of federal firearm laws. In response, Senior filed a motion to suppress similar to the one granted in his state criminal proceedings. The district court denied Senior's motion, finding that the search warrant was supported by probable cause and the firearms and marijuana were discovered in plain view in connection with the valid search. *United States v. Wolfe*, 22 F. Supp. 2d 627, 640, 642 (E.D. Mich. 1998). We subsequently affirmed the district court's ruling in that case. *United States v. Wolfe*, No. 99-1696, 2000 WL 1562833, at *1 (6th Cir. Oct. 11, 2000), *cert. denied*, 533 U.S. 930 (2001).

The state criminal case against Junior proceeded to trial because the charges against him were unrelated to the firearms and marijuana found in the vault. Junior was convicted of larceny over $100.00, but the conviction was later set aside due to trial publicity, and ultimately dismissed. Following the dismissal of the criminal charges, Junior brought suit in Livingston County Circuit Court against Perry, Sheriff's Deputy Deering, Sergeant Robert Swackhamer ("Swackhamer"), Assistant Prosecutor Rose, Harp, and Van Patten pursuant to 42 U.S.C. § 1983. The complaint alleges that the defendants violated Junior's Fourth Amendment right to be free from an unreasonable search and seizure as well as various state-law claims. Pursuant to 28 U.S.C. § 1441(b), the defendants removed the case to the United States District Court for the Eastern District of Michigan.**3** Following discovery, the defendants moved for summary judgment on the ground that Junior's claims were barred either by the statute of limitations or collateral estoppel due to Senior's federal criminal case. In the alternative, the defendants argued they were entitled to summary judgment because there was probable cause for the search and arrest.

In response to the summary judgment motions, Junior dismissed the claims against Swackhamer and Deering and conceded that he lacked standing to challenge the search of his father's residence, leaving only the claims against Rose and Perry. On December 18, 2001, the district court granted summary judgment to Rose because Junior failed to state a claim under § 1983 and Rose was entitled to absolute immunity for actions performed within the scope of his prosecutorial duties. Furthermore, the district court granted summary judgment to Perry on the ground that Junior's constitutional and state-law claims against him were barred by Michigan's statute of limitations. The district court found that all the claims against Perry related to Junior's arrest on December 23, 1996, or actions undertaken before that date. As a result, the district court determined that the statute of limitations for the federal and state claims had run by the time Junior filed his suit on January 28, 2000. Junior appeals only the district court's ruling with regard to his claims against Perry.

On December 28, 2001, Deering, Perry, and Rose filed a motion pursuant to 42 U.S.C. § 1988 for costs and attorney fees, claiming that Junior's claims were frivolous. The district court

---

**2**Despite containing applications for arrest warrants for several incidents, the Joint Appendix includes only one arrest warrant for Junior issued on December 19, 1996, which relates to the stolen hay. J.A. at 242 ("Warrant Felony").

**3**The district court entered default judgments against Harp and Van Patten that are not part of this appeal.

agreed and awarded the three defendants $656.15 in costs and $10,000 in attorney fees.  Junior appeals the award of attorney fees.

## II.  ANALYSIS

### A.  Statute of Limitations

In his appeal, Junior argues that the district court erred in holding that the statute of limitations on his claims against Perry began to run at the time of his arrest.  We have held that a district court's determination that a complaint was filed outside of the statute of limitations is a conclusion of law, which we review de novo.  *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003).  Upon review, we conclude that the statute of limitations did not begin to run on his constitutional claim and his state-law malicious-prosecution claim until after the criminal charges against Junior were dismissed, and therefore, his claims against Perry were timely filed.  We need not decide the timeliness issue with regard to Junior's state-law false-arrest claim however, because it can be resolved on other grounds.

Because Congress did not specifically adopt a statute of limitations governing § 1983 actions, "federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought."  *Id.* (citing *Wilson v. Garcia*, 471 U.S. 261, 275-76 (1985)).  We have held that the appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims.  Mich. Comp. Laws Ann. § 600.5805(10); *Chippewa Trading Co. v. Cox*, 365 F.3d 538, 543 (6th Cir.), *cert. denied*, 125 S. Ct. 500 (2004); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir.), *cert. denied*, 479 U.S. 923 (1986).  "Although state law provides the statute of limitations to be applied in a § 1983 damages action, federal law governs the question of when that limitations period begins to run."  *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984); *see also Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir.), *cert. denied*, 540 U.S. 876 (2003).

"Typically the statute of limitations for filing an action alleging an unconstitutional search and seizure begins to run at the time of the injury," when the plaintiff becomes aware of the unconstitutional action.  *Shamaeizadeh v. Cunigan*, 182 F.3d 391, 394 (6th Cir.), *cert. denied*, 528 U.S. 1021 (1999).  We have held, however, that in light of the Supreme Court's ruling in *Heck v. Humphrey*, 512 U.S. 477 (1994), "[a] cause of action under § 1983 that would imply the invalidity of a conviction does not accrue until the conviction is reversed or expunged, and therefore the statute of limitations does not begin to run until such an event occurs, if ever."  *Shamaeizadeh*, 182 F.3d at 396.  We have noted "that the concerns of *Heck* apply pre-conviction as well as post-conviction."  *Id.* at 398.  Thus, we have applied the *Heck* principle to § 1983 claims that if successful "'would necessarily imply the invalidity *of a future conviction on a pending criminal charge*.'"  *Id.* at 397 (emphasis added) (quoting *Smith v. Holtz*, 87 F.3d 108, 113 (3d Cir.), *cert. denied*, 519 U.S. 1041 (1996)).  If civil claims were allowed while criminal cases were pending, "'there would be a potential for inconsistent determinations in the civil and criminal cases and the criminal defendant would be able to collaterally attack the prosecution in a civil suit.'"  *Id.* at 397-98 (quoting *Smith*, 87 F.3d at 113).  Instead, a criminal defendant should "focus on his primary mode of relief — mounting a viable defense to the charges against him — before turning to a civil claim under § 1983."  *Id.* at 399.

Applying these principles to the instant case, we conclude that the district court erred in finding that the statute of limitations began to run on December 23, 1996, the date of Junior's arrest.  In his complaint, Junior alleges that Perry conspired with Harp and Van Patten in order to arrest and charge Junior for crimes that he did not commit.  J.A. at 24 (Compl. at 6).  Specifically, Junior alleges that Perry's probable-cause determination relied on information supplied by Harp and Van Patten, which Perry knew was false.  J.A. at 24 (Compl. at 6).  Thus, success on his constitutional

claim necessarily implies that Harp and Van Patten lied about Junior's involvement in the various thefts.  Given that the information that Harp and Van Patten provided was central to the state criminal prosecution, resolution of the civil claim in Junior's favor while the criminal case was pending would certainly imply the invalidity of any future conviction.  Therefore, we conclude that the statute of limitations applicable to the § 1983 claim against Perry did not begin to run until dismissal of the criminal charges against Junior on July 15, 1998.  J.A. at 741 (State Ct. Order).  Junior filed his civil complaint against Perry on January 28, 2000, well within Michigan's three-year statute of limitations period.  Thus, we conclude that the district court erred in holding that Junior's Fourth Amendment claim against Perry was time barred.

Similarly, the district court erred in finding Junior's state-law claim of malicious prosecution to be time barred as well.  Under Michigan law, a person must bring a malicious-prosecution claim within two years after the claim first accrued.  Mich. Comp. Laws Ann. § 600.5805(5).  "As a general rule, tort actions accrue when all the elements of a cause of action have occurred and can be alleged in a proper complaint."  *Parisi v. Mich. Townships Ass'n*, 332 N.W.2d 587, 589 (Mich. Ct. App. 1983).  With regard to a malicious-prosecution claim, "[t]ermination of the underlying criminal proceedings in the plaintiff's favor is a necessary element of the civil cause of action for malicious prosecution."  *Gebhardt v. O'Rourke*, 510 N.W.2d 900, 907 (Mich. 1994).  Michigan courts have defined "termination of the criminal proceedings in favor of the accused" to include "the formal abandonment of the proceedings by the public prosecutor."  *Cox v. Williams*, 593 N.W.2d 173, 174-75 (Mich. Ct. App. 1999).  Specifically, the "dismissal of criminal charges at the instance of the prosecutor . . . implies a lack of reasonable ground for prosecution and is a favorable termination of the proceeding for purposes of a malicious prosecution cause of action."  *Id.* at 175.  Thus, Junior's malicious-prosecution claim first accrued when the prosecutor decided to dismiss the criminal charges against him on July 15, 1998.  J.A. at 741 (Dismissal Order).  Pursuant to Michigan law, Junior had two years from that date within which to bring his malicious-prosecution claim.  Because Junior filed suit against Perry within that applicable period, the district court erred in ruling that his malicious-prosecution claim was time barred.

Junior's state-law claim for false arrest is a bit more problematic.  Under Michigan law, "false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant."  *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003).  "To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause."  *Id.*  Under Michigan law, a person must bring a false-arrest claim within two years after the claim first accrued.  Mich. Comp. Laws Ann. § 600.5805(2).  All the elements of the cause of action of false arrest accrued on December 23, 1996, the date upon which Perry arrested Junior.  Therefore, the district court found that the Michigan's two-year statute of limitations period began to run on that date and had expired in 1998, two years prior to Junior's filing of his complaint.  Michigan courts have specifically reserved the question of whether the *Heck* rationale applies to state-law false-arrest claims.  *See Peterson Novelties, Inc.*, 672 N.W.2d at 360 n.11 (resolving the false-arrest claim on the issue of probable cause, and thereby, finding it unnecessary to determine the applicability of *Heck*).  We need not resolve this issue either because we can resolve the false-arrest claim against Perry on other grounds.

In sum, we conclude that the district court erred in finding Junior's constitutional claim and his state-law malicious-prosecution claim to be time barred.  We do not resolve the issue of timeliness with regard to Junior's state-law false-arrest claim, however.

## B.  Collateral Estoppel

Perry argues in his brief that even if Junior's claims were filed timely, because of the prior decisions in Senior's federal criminal case, the doctrine of collateral estoppel bars his claims.  We have held that "[t]he availability of collateral estoppel is a mixed question of law and fact which this court reviews de novo." *Hammer v. INS*, 195 F.3d 836, 840 (6th Cir. 1999), *cert. denied*, 528 U.S. 1191 (2000).  Applying this standard, we conclude that the doctrine of collateral estoppel is inapplicable in this case.

The United States Supreme Court has defined the doctrine of collateral estoppel, also known as issue preclusion, as "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979).  Though the exact requirements necessary to invoke collateral estoppel are listed slightly differently in our various opinions, we have stated recently that collateral estoppel applies when:

(1)  the issue in the subsequent litigation is identical to that resolved in the earlier litigation,
(2)  the issue was actually litigated and decided in the prior action,
(3)  the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation,
(4)  the party to be estopped was a party to the prior litigation (or in privity with such a party), and
(5)  the party to be estopped had a full and fair opportunity to litigate the issue.

*Santana-Albarran v. Ashcroft*, 393 F.3d 699, 704 (6th Cir. 2005).  Perry argues that because the federal district court and this court previously held that there was probable cause to believe Senior committed a criminal offense, Junior is precluded from relitigating the probable-cause issue based on the same evidence in this case.  We find this argument to be unpersuasive.

Probable cause necessary to justify an arrest is defined as "whether at that moment [of the arrest] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  In Senior's criminal case, the district court found that based on the facts and circumstances known on December 23, 1996, probable cause existed to believe that Senior was involved in numerous crimes and the evidence of those crimes would be found at the Fisher Road residence. *Wolfe*, 22 F. Supp. 2d at 637.  Central to the district court's finding was its conclusion that Harp and Van Patten were credible. *Id.*  The district court's determination does not necessarily mean, however, that the same evidence supports such a conclusion regarding Junior.  Probable cause to arrest someone is an individualized determination made for each person based on the known facts and circumstances at the time. *See, e.g., Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (holding that "the belief of guilt must be particularized with respect to the person to be searched or seized"); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").  Evidence sufficient to support probable cause of criminal wrongdoing of one does not necessarily imply that the same evidence is sufficient to justify probable cause to arrest another.  The issue before the district court in Senior's criminal proceeding was probable cause of Senior's criminal wrongdoing; the issue of probable cause to believe Junior's criminal wrongdoing was never addressed.  Therefore, because the issue decided in Senior's criminal case is not identical to the one in this litigation, we conclude that the doctrine of collateral estoppel does not apply.

**C.  Probable Cause**

Finally, Perry argues in his brief that even if Junior's claims were not collaterally estopped, Perry should be entitled to summary judgment in his favor because probable cause existed to arrest Junior.  We agree.

We review a district court's grant of summary judgment de novo.  *Fisher v. Harden*, 398 F.3d 837, 841 (6th Cir. 2005).  "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "In deciding upon a motion for summary judgment, we must view the factual evidence and draw all reasonable inferences in favor of the non-moving party."  *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

As we stated above, probable cause necessary to justify an arrest is defined as "whether at that moment [of the arrest] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense."  *Beck*, 379 U.S. at 91.  A reviewing court must assess the existence of probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal quotations omitted), *cert. denied*, 537 U.S. 819 (2002).  In this case, probable cause to arrest Junior was based on the information provided by Harp and Van Patten.  When an informant's tip is used to establish probable cause, the Supreme Court has stated that a court should review the probable cause determination based on the "totality of the circumstances" rather than any rigid test.  *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983).  The Supreme Court noted however that "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report."  *Id.* at 230.  Furthermore, the Court underscored "the value of corroboration of details of an informant's tip by independent police work."  *Id.* at 241.

In this case, the information upon which Perry relied was not an "uncorroborated tip of an unknown informant."  *United States v. Perkins*, 994 F.2d 1184, 1188 (6th Cir.), *cert. denied*, 510 U.S. 903 (1993).  Instead, the information about Junior's involvement in criminal activity was provided by two known sources, Harp and Van Patten.  *See United States v. Couch*, 367 F.3d 557, 560-61 (6th Cir. 2004) (holding that a known informant is inherently more credible because the informant "could potentially be held accountable for providing false information").  Furthermore, they provided highly detailed descriptions of criminal wrongdoing, including criminal activity in which they themselves participated, further bolstering the credibility of their information.  Harp even admitted to Perry that he still possessed one of the stolen golf carts.  The informants had a close relationship with Senior, which provided them with a solid basis of knowledge from which to speak about his and Junior's various criminal activities.  Specifically, Harp stated that he and Senior were friends and that he had been at the Fisher Road residence numerous times.  Van Patten had worked for Senior for two years and lived at the Fisher Road residence for nine months, thereby witnessing firsthand the activities which occurred there.

In addition, the information which Harp and Van Patten told Perry was corroborated by the police incident reports from the times of the thefts.  For example, the police incident report regarding the stolen hay notes that the abandoned wagons were found with "[f]resh pine bough pieces" and "pine cone," which supports Van Patten's statement to Perry that they had to drive through pine trees to reach the old plane hangar.  J.A. at 191 (Police Incident Rep.); 194 (Det. Off. Rep. Supp.).  Van Patten's description of the sudden appearance of the construction materials while he was building the pole barn matches the dates in the police incident reports concerning when the materials were stolen.  Perry also independently verified the informants' claims through discussions with

Sergeant Swackhamer, who corroborated the existence of pine trees at the Fisher Road residence, as well as the presence of a golf cart.

Finally, Van Patten and Harp corroborated each other's stories. Van Patten corroborated Harp's story of the golf carts by providing Perry with a picture of the deck he built, in which a golf cart is visible in the background. Harp and Van Patten also corroborated each other with regard to the stolen residential windows which were stored at Harp's barn and then brought by Junior to the Fisher Road residence for use in construction of the log cabin by Van Patten. The stories told by Harp and Van Patten are also remarkably similar with regard to the manner in which the thefts occurred (e.g., late at night, use of walkie talkies, carrying firearms), which further bolsters their credibility. Thus, based on the totality of the circumstances, we conclude that the information provided by Harp and Van Patten was more than sufficient to support a finding of probable cause to arrest Junior.

Junior relies heavily on minor inaccuracies and omissions in the affidavit accompanying the search warrant for the Fisher Road residence to argue that Perry knowingly provided false information to obtain the arrest warrant.[4] Specifically, Junior argues that Perry ignored the original police incident report regarding the stolen hay which states that the wagons' tire tracks were visible on the dirt roads and went beyond the main entrance of the Fisher Road residence. J.A. at 192 (Police Incident Rep.). Junior argues that these tire tracks prove that Van Patten's story is inaccurate and therefore, Perry should not have relied on it to obtain the arrest warrant. While the presence of the tire tracks does conflict with Van Patten's story of the hay theft, it is insufficient by itself to dispel the existence of probable cause of Junior's criminal wrongdoing in light of all the evidence available to Perry. Van Patten was a participant in the theft and provided Perry with an eyewitness, firsthand account, which is not invalidated merely because of a single inconsistency. Van Patten stated that he was shaken up by his participation in the robbery and could not drive back. Thus, a reasonable police officer could believe that because of his agitated state he did not notice the precise route the trucks took to get back to airport hangar on the Fisher Road residence. Van Patten's detailed description of the robbery, coupled with its similarities in the manner in which the golf carts were stolen, and corroborated by the presence of the pine cones and branches in the wagons is sufficient to establish probable cause to arrest Junior even in light of the inconsistent tire tracks. "Officers are not required to rule out every possible explanation other than a suspect's illegal conduct before making an arrest." *United States v. Reed*, 220 F.3d 476, 478 (6th Cir. 2000), *cert. denied*, 531 U.S. 1103 (2001).

Moreover, assuming *arguendo* that the tire tracks were sufficient to dispel the belief that Junior participated in the hay theft, probable cause still existed to believe that Junior was involved in the theft of the golf carts and construction materials. Harp provided a detailed account of the theft of the golf carts, which matches the incident reports taken at the time. He also admitted that one of the stolen golf carts was still on his property. Van Patten provided a picture of the Fisher Road residence in which the golf cart appeared. While Perry did erroneously state in the search warrant affidavit that Swackhamer had verified through serial numbers that the golf cart at Harp's property was one of the two stolen from the country club, that error by itself is insufficient to dispel the probable cause of Junior's criminal wrongdoing in light of all the other evidence. Similarly, Van Patten's story about the stolen construction materials, which matched the materials mentioned in the incident reports, is sufficient to establish probable cause of criminal wrongdoing as well.

---

[4] It should be noted that the Junior's argument rests on inaccuracies contained in the six-page affidavit written by Perry on December 19, 1996, to obtain the search warrant for the Fisher Road residence. The arrest warrants for Junior were requested the previous day, December 18, 1996, and it is unclear whether a similar affidavit or other supporting materials were provided which contained the same inaccuracies.

Because Junior's arrest on December 23, 1996, was supported by probable cause, there was no constitutional violation and therefore, we affirm the district court's grant of summary judgment to Perry on the Fourth Amendment claim. Furthermore, because the absence of probable cause is a necessary element for the state-law claims of false arrest and malicious prosecution, we affirm the district court's grant of summary judgment to Perry on those claims as well.

## D.  Attorney Fees

In the second of the two appeals before this court, Junior challenges the district court's award of attorney fees to defendants Perry, Rose, and Deering. "We review a district court's award of attorneys fees under 42 U.S.C. § 1988 based on an abuse of discretion standard." *Wilson-Simmons v. Lake County Sheriff's Dep't*, 207 F.3d 818, 823 (6th Cir. 2000). "In light of a 'district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters,' an award of attorneys' fees under § 1988 is entitled to substantial deference." *Reed v. Rhodes*, 179 F.3d 453, 469 n.2 (6th Cir. 1999) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). Applying this deferential standard, we conclude that awarding attorney fees to Deering and Rose was not an abuse of discretion. In light of our earlier holding that Junior's constitutional claim against Perry was not time barred, we vacate the award of attorney fees to Perry and remand the issue to the district court for reconsideration. Finally, because the district court did not apportion the total amount of the award among the three defendants, we vacate the amount of the award and remand to the district court for redetermination.

Pursuant to 42 U.S.C. § 1988, a district court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The Supreme Court has held that "while prevailing plaintiffs are entitled to attorneys fees under that statute in all but special circumstances, prevailing defendants are entitled to attorneys fees much less frequently."[5] *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 182 (6th Cir.) (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417-18 (1978)), *cert. denied*, 473 U.S. 906 (1985). "[A] prevailing *defendant* should only recover upon a finding by the district court that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Wayne v. Village of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994) (internal quotation omitted), *cert. denied*, 514 U.S. 1127 (1995). "Application of these standards requires inquiry into the plaintiffs' basis for bringing suit." *Smith*, 754 F.2d at 183. The Supreme Court has noted, however, that "[i]n applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg*, 434 U.S. at 421-22.

### 1.  Frivolous, Unreasonable or Without Foundation

The first argument Junior raises in this appeal is that the district court erred in awarding attorney fees to Perry, Deering, and Rose because even though Junior did not prevail, his claims had a colorable basis in law and fact. We have noted that "courts have awarded attorneys fees to prevailing defendants where no evidence supports the plaintiff's position or the defects in the suit are of such magnitude that the plaintiff's ultimate failure is clearly apparent from the beginning or at some significant point in the proceedings after which the plaintiff continues to litigate." *Smith*, 754 F.2d at 183. Thus, in *Wilson-Simmons v. Lake County Sheriff's Department*, we upheld an award of attorney fees to a prevailing defendant where the plaintiff presented no evidence in support of her claims of racial discrimination by the defendants. 207 F.3d at 823. In upholding the award, we agreed with the district court's finding that the plaintiff "had failed to set forth a prima facie case

---

[5]In *Christiansburg*, the Supreme Court was discussing the attorney fee provision in Title VII, not § 1988. We have held, however, that "Congress intended that the standards for awarding fees under section 1988 should be the same as those under Title VII and other acts allowing awards of attorneys fees." *Smith*, 754 F.2d at 183.

of racial discrimination or retaliation and that her claims were without foundation from the outset." *Id.* at 824. Similarly, in this case, the district court below found "both a lack of evidence supporting [Junior's] claims, and significant defects in those claims that made [Junior's] ultimate failure apparent at the outset of this action." J.A. at 932 (Dist. Ct. Op. at 7). Upon review, we conclude that the district court's finding with regard to Junior's claims was not an abuse of discretion.

In the complaint, Junior first alleges that Perry and Deering violated his constitutional rights by performing an illegal search of the Fisher Road residence. In his deposition, Junior admitted that he did not own or reside at the residence, nor did he own any of the property seized from it. J.A. at 254-55 (Junior Dep. at 19-20). Therefore, any illegal search of the Fisher Road residence would violate Senior's constitutional rights; Junior's rights would be unaffected. Thus, the district court correctly concluded that Junior's illegal search claim was defective from the outset of the suit. *See Alderman v. United States*, 394 U.S. 165, 174 (1969) (holding that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted"). Despite this obvious defect, however, Junior continued to pursue this claim against the defendants until a motion for summary judgment was filed. In his brief, Junior argues that he was not actually bringing an illegal search claim, but rather simply using the application for the search warrant to prove Perry's practice of using false information in order to establish probable cause. This argument is belied by the language in the complaint itself, which states that "Perry, under the direction of Defendant Deering, and with the help of Defendant, Swackhamer," conducted a search of the Fisher Road residence without probable cause based on a warrant which they obtained by making false statements about Junior. J.A. at 22 (Compl. at 4). Thus, the complaint asserts an unconstitutional-search claim, which was clearly defective at the outset of the case.

In addition, Junior's other claims against the defendants rely on little more than unsupported allegations. For example, Junior alleges that Perry filed a criminal complaint against him "for the purpose of causing pain to his father Ronald Wolfe, Sr. and to continue on a vendetta against the family." J.A. at 22 (Compl. at 4). In addition, at his deposition, Junior stated that Deering orchestrated Junior's arrest and conviction because of personal animosity towards Senior. J.A. at 256-57 (Junior Dep. at 23-24). After a lengthy discovery period, Junior has failed to uncover any evidence in support of either of the contentions that Perry and Deering were motivated by bad faith. Furthermore, Junior alleges that the police officers conspired with the chief informants, Harp and Van Patten, to "give credence, legality and authenticity to their illegal conduct." J.A. at 22 (Compl. at 4). Once again, Junior presented no evidence in the record that Perry conspired with Harp and Van Patten to falsify information to justify Junior's arrest. Moreover, Deering and Swackhamer were not even directly involved in the investigations into the various robberies and did not interact with Harp and Van Patten at all. Thus, because these claims are unsupported by any evidence in the record, we conclude that the district court did not abuse its discretion in finding them frivolous.

With regard to his criminal conviction, Junior alleges in his complaint that Deering authorized Perry to give an interview to a local newspaper and Rose placed the article in the jury room during deliberations. J.A. at 25 (Compl. at 7). In his brief to this court, Junior reiterates his claim that the article was put in the jury room. Appellant's Br. at 23. While Junior's state-court conviction was subsequently overturned due to trial publicity, Junior has not presented any evidence in the record that the newspaper article was ever in the jury room or that Rose was in any way involved in putting it there. J.A. at 339-340 (Rose Dep. at 87-88), 1012-1013 (Dist. Ct. Op. at 4-5). The argument in his brief does not cite any part of the joint appendix or the state-court-trial transcript in support of Junior's claim that the newspaper article was given to the jury. Furthermore, Junior also alleges that Rose prepared a false bench warrant, but again provides no evidence in support of that allegation. J.A. at 25 (Compl. at 7), 341-42 (Bench Warrants). The bench warrants were issued because Junior failed to appear when his case was called. There is no evidence that Rose had any involvement in issuing them. Moreover, aside from the lack of a factual basis, the claims against Rose would be barred by prosecutorial immunity, because all the allegations against

Rose arise from his duties as county prosecutor.  Thus, we conclude that the district court did not abuse its discretion in finding the claims against Rose to be without any foundation.

Finally, with regard to the Fourth Amendment claim against Perry with respect to Junior's arrest, the district court held that this was frivolous as well because it was time barred.  As we stated above, the district court erred in that determination.  Thus, whether Perry is entitled to attorney fees for this claim rests on whether the claim had a colorable basis in law and fact.  While we concluded above that Perry did have probable cause to arrest Junior, our conclusion does not necessarily imply that Junior's claim was frivolous or lacked foundation.  Thus, we vacate the attorney fee award to Perry and remand to the district court to determine if Junior's Fourth Amendment claim was also frivolous, unreasonable, or without foundation.

In sum, we conclude that the evidence in the record supports the district court's finding that Junior's claims against Deering and Rose, as well as the illegal-search claim brought against Perry, were frivolous and lacked factual support.  Therefore, the district court did not abuse its discretion in awarding Deering and Rose attorney fees under § 1988 on those claims.  We vacate the attorney fee award to Perry, however, and remand this case to the district court for reconsideration in light of our opinion.

### 2. Voluntary Dismissal

The second argument Junior raises in this appeal is that because Junior voluntarily dismissed Deering from the suit, Deering is not a prevailing party entitled to attorney fees pursuant to § 1988.  Because this argument was not raised below, we decline to address this issue at this stage.

In his brief to this court, Junior argues that the award of attorney fees to Deering is inappropriate because Junior voluntarily dismissed him from the action.  Whether a defendant who obtains a voluntary dismissal is a prevailing party for purposes of § 1988 remains an open question in this court.  *See Roane v. City of Mansfield*, No. 98-4560, 2000 WL 1276745, at *3 (6th Cir. Aug. 28, 2000) (Jones, J. concurring) ("Accordingly, by receiving a voluntary dismissal with prejudice of [the plaintiff]'s suit, the [defendant] is a prevailing party under § 1988."); *id.* at *4 (Batchelder, J. dissenting) (same).  We need not decide the issue in this case however, because "[a]rguments that were not raised below may not be asserted on appeal."  *PACCAR Inc. v. TeleScan Techs., LLC*, 319 F.3d 243, 258 (6th Cir. 2003).  "[W]e review the case presented to the district court rather than a better case fashioned after the district court's order."  *Chao v. Hall Holding Co.*, 285 F.3d 415, 427 (6th Cir. 2002) (internal quotation omitted), *cert. denied*, 537 U.S. 1168 (2003).  Before the district court, Junior did not challenge Deering's status as a prevailing party under § 1988.  *See* J.A. at 931 (Dist. Ct. Op. at 6) ("There is no dispute that Defendants are the 'prevailing party' with respect to Plaintiff's § 1983 claims.").  Accordingly, we decline to address this issue at this stage of the case.

### 3. Award Amount

The next argument Junior raises in this appeal is that the district court erred in calculating the amount of the award.  Upon review, we conclude that the district court did not abuse its discretion in awarding attorney fees in the amount of $10,000.

Junior does not challenge the hourly rates of the defendants' attorneys, but instead argues that because summary judgment was granted based on the statute of limitations, which required minimal attorney preparation, the $10,000 award is excessive.  As we stated above, however, the district court erred in holding that Junior's constitutional claim against Perry was time barred.  As a result, the work completed by Perry's attorneys on alternative arguments has proven its worth.  The defendants presented the same arguments to the district court as they did before this court.  Parties cannot be charged with predicting which legal argument will carry the day and only be compensated for the work needed for that winning one.

Junior also argues that § 1988 only provides for attorney fees for work done in connection with the § 1983 claims, and therefore, no fees should be awarded for work done on the state-law claims. The district court agreed, and stated that it would "only consider the attorney fees incurred in defending against Plaintiff's § 1983 claims." J.A. at 931 (Dist. Ct. Op. at 6). While the fee amounts submitted to the district court were not apportioned between the § 1983 claims and the related state-law claims, the district court reviewed the itemized expense report and concluded that "*at least* $10,000 in attorney fees was incurred in defending against Plaintiff's § 1983 claims in this action." J.A. at 936 (Dist. Ct. Op. at 11). Junior has not presented any arguments why the district court's reasoning was an abuse of discretion.

Because neither of Junior's arguments are persuasive, we conclude that the district court did not abuse its discretion in awarding attorney fees in the amount of $10,000. Because the award amount was not apportioned among Perry, Deering, and Rose, however, we must vacate the entire award to allow the district court to reconsider the award to Perry in light of our conclusion that the Fourth Amendment claim against him was not time barred.

### 4. Ability to Pay

The final argument Junior raises in this appeal is that the district court abused its discretion by requiring Junior to pay attorney fees despite his inability to do so. Upon review, we conclude that even in light of Junior's financial condition the district court did not abuse its discretion in awarding the defendants attorney fees.

In this circuit, we have not yet decided in a published opinion the issue of whether a plaintiff's inability to pay bars an award of attorney fees to a prevailing defendant under § 1988. *See Yinger v. City of Dearborn*, No. 96-2384, 1997 WL 735323, at *6 (6th Cir. Nov. 18, 1997) (holding in an unpublished opinion that a plaintiff's inability to pay does not factor into decision *whether* an attorney fee award is appropriate), *cert. denied*, 524 U.S. 926 (1998). All the courts of appeals which have addressed the issue have concluded that a nonprevailing plaintiff's ability to pay is not "a proper factor to consider in determining *whether* to award attorneys' fees against [the plaintiff]," but may be considered "when determining *the amount* of the attorneys' fees to be awarded against that party." *Alizadeh v. Safeway Stores, Inc.*, 910 F.2d 234, 238 (5th Cir. 1990); *see also Gibbs v. Clements Food Co.*, 949 F.2d 344, 345 (10th Cir. 1991); *Miller v. L.A. County Bd. of Educ.*, 827 F.2d 617, 621 (9th Cir. 1987); *Munson v. Friske*, 754 F.2d 683, 697 (7th Cir. 1985); *Arnold v. Burger King Corp.*, 719 F.2d 63, 68 (4th Cir. 1983), *cert. denied*, 469 U.S. 826 (1984); *Charves v. W. Union Tel. Co.*, 711 F.2d 462, 465 (1st Cir. 1983); *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 917 (11th Cir. 1982); *Faraci v. Hickey-Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir. 1979). As the Fifth Circuit explained, "deterring suits without reasonable foundation, a purpose of the attorneys' fees provision, is not subserved by creating an exception for frivolous suits by the impecunious." *Alizadeh*, 910 F.2d at 238 (internal citation omitted). The Ninth Circuit cautioned however, that "[w]hile an award of attorney's fees for a frivolous lawsuit may be necessary to fulfill the deterrent purposes of 42 U.S.C. § 1988 . . . , the award should not subject the plaintiff to financial ruin." *Miller*, 827 F.2d at 621. We agree with the reasoning of our sister circuits, and therefore hold that a nonprevailing plaintiff's ability to pay may be used as a factor to determine the size of the award, but not whether an award is appropriate in the first place.

In this case, the district court properly followed this approach and took Junior's financial situation into consideration in deciding the amount of the award. J.A. at 935 (Dist. Ct. Op. at 10). The district court evaluated Junior's present financial obligations and noted that many of Junior's monthly expenses were related to loans which were maturing, and therefore, would no longer burden Junior in the future. The district court concluded that $10,000, a quarter of the $41,578.50 which the prevailing defendants were seeking, was an appropriate amount in light of Junior's overall

financial situation.  Junior has not made any argument in his brief nor cited any evidence in the record to demonstrate that the district court abused its discretion.

### III.  CONCLUSION

In conclusion, we **AFFIRM** the district court's grant of summary judgment to Perry in the first appeal.  In the second appeal, we **AFFIRM** the grant of attorney fees to Deering and Rose.  We **VACATE** the award to Perry, however, and **REMAND** this case to the district court to determine if Junior's claims against Perry were frivolous, unreasonable, or without foundation.  Furthermore, because the award amount was not apportioned among the three defendants, we **VACATE** the entire award amount and **REMAND** the case to the district court to reconsider the award to Perry and apportion the amount among the defendants.